IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MICHAEL A. ALEXANDER,

    Plaintiff,

v.

DR. JAMES RICHTER, et al.

    Defendants.

OPINION & ORDER

Case No. 15-cv-766-wmc

---

*Pro se* plaintiff Michael Alexander has been granted leave to proceed against two defendants, Dr. James Richter and Meredith Mashak, under 28 U.S.C. § 1983, on his Eighth Amendment claim for the delays he experienced in receiving eye care at the Columbia Correctional Institution ("CCI"). Now before the court are defendants' motions for summary judgment (dkts. #38, #48), as well as several motions filed by Alexander. For the reasons that follow, defendants' motions will be granted and plaintiff's motions will be denied.

UNDISPUTED FACTS[1]

A. Background

Alexander is currently incarcerated at CCI in Portage, Wisconsin. Dr. James Richter, is a licensed optometrist and corporate officer for Richter Professional Services, S.C., while Meredith Mashak, is the supervisor of CCI's Health Services Unit ("HSU").

---

[1] The following facts are undisputed unless otherwise noted, and were drawn from the parties' proposed findings of fact and supporting evidence.

1

During the relevant time period, Dr. Richter was the manager of CCI's optical department, and in this role, he hired all optometrists and arranges their schedules at CCI. However, he has no duties that entail his being regularly on-site at CCI, nor does he control how frequently another eye doctor visits CCI. According to both Richter and Mashak, who is on-site at CCI, the DOC Bureau of health Services Medical Director controls the frequency of visits, and CCI HSU staff are responsible for scheduling eye appointments and coordinates the frequency of optometrist visits at CCI per month.

Nevertheless, Dr. Richter does visit CCI to see inmates very infrequently -- about one or two times a year -- although that only happens when CCI requests an optometrist and no one else is available because of scheduling conflicts. Moreover, CCI only contacts Richter directly when its staff has already been unsuccessful finding coverage through other Richter Professional Services optometrists. When any optometrist from Richter Professional Services visits CCI, he or she receives a list of inmates to be seen that day, but usually does not know what inmates are on the list before arriving.

Generally, inmates request eye appointments by submitting a Health Service Request ("HSR") with CCI's HSU, which determines the level of urgency related to the request and refers it for scheduling. In 2015, the two nurses that handled scheduling at CCI were Rachel Pafford and Ms. Felton. As the HSU supervisor, Mashak was not involved in reviewing those requests or scheduling appointments. Indeed, the only time that she reviewed this optical schedule was when she was contacted about it.

As optometrists are not generally on site in CCI's HSU, inmates are placed on a waiting list, to be seen when an optometrist is present. Mashak did not know exactly how

often optometrists came to CCI, but she testified that two doctors came at least twice a month. From January through April 2015, optometric services were available at CCI on thirteen different days: three times in January, February and March, and four times in April. The amount of time an inmate must actually wait for his eye appointment at CCI depends on the doctors' work schedules, the length of each appointment and the seriousness of the inmate's condition.

B. Alexander's Eye Appointments

On January 8, 2015, Alexander submitted a written request with HSU for an evaluation by an eye doctor. At that time, he wrote that his two-year check-up was due and he needed a stronger prescription. Nurse Pafford responded that an appointment was scheduled. However, after hearing nothing more, Alexander submitted another request on February 23, 2015, to see an eye doctor, stating: "I requested over a month ago to be seen by the eye doctor, this is my two year appointment could you have the eye doctor call me?" (Dkt. #2-1, at 13.) On February 26, 2015, Nurse Felton responded: "you are on the list to see optical currently a 5 month wait." (*Id*.) Alexander then submitted another request on March 5, 2015, this time stating, "when I read[,] I get headaches very bad ones[. M]y eyes do not focus as fast as they use[d] to and sometimes I see white spots. I need to see an eye doctor." (Dkt. #2-1, at 14.) The next day, Pafford again replied: "appointment scheduled."

Apparently hearing nothing for yet another month, Alexander submitted a request slip on April 5, 2015. in which he requested an eye doctor, and he explained that: his headaches were getting worse; his eyes water when he tries to focus them; and he sees spots.

3

Nurse Pafford responded to this request on April 7, 2015, stating simply that he had an appointment "soon."

On April 23, 2015, Dr. Ruder from Richter Professional Services, examined Alexander. Dr. Ruder noted that Alexander's specific eye complaint was an increase in migraines after reading, and prescribed Alexander glasses for reading only, specifically +1.50/-.50/50 for his right eye, and +1.75/SPH for his left eye. Dr. Ruder also determined that Alexander's vision at that point was actually better than any previous prescription. (Richter decl. Ex. D. (dkt. 41-4) at 12-14.) According to Dr. Ruder's notes, Alexander's change in prescription was a response to his inconsistent use of the glasses against the previous advice of optometrists.

On May 1, 2015, Alexander submitted another information request form. This time, he complained about headaches and eye pain because he had to wait for his eye appointment. On May 11, 2015, the HSU supervisor, defendant Mashak, responded that CCI has two, part-time optical doctors who come to CCI at least two days a month, sometimes three. (Dkt. #2-1, at 15.) Alexander received new glasses on May 4, 2015.

OPINION

I.     **Summary Judgment Motion**

Plaintiff claims that the delay he experienced before his April appointment resulted in headaches that became migraines. On that basis, as well as the allegation that the delay resulted in plaintiff injuring his eyes, the court permitted him to proceed on claims that

Dr. Richter and Mashak violated his Eighth Amendment rights in failing to ensure that an eye doctor evaluated him in a timely fashion.

A prison official may violate the Eighth Amendment if the official is "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). "Serious medical needs" include (1) conditions that are life-threatening or that carry risk of permanent serious impairment if left untreated, (2) withholding of medical care that results in needless pain and suffering, or (3) conditions that have been "diagnosed by a physician as mandating treatment." *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997). "Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment, but are disregarding the risk by consciously failing to take reasonable measures. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Allegations of delayed care, even a delay of just a few days, may violate the Eighth Amendment if the delay caused the inmate's condition to worsen or unnecessarily prolonged his pain. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (citations omitted); *Smith v. Knox County Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012); *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011).

Under this standard, plaintiff's claim has three elements:

1. Did plaintiff objectively need medical treatment?

2. Did defendants know that plaintiff needed treatment?

3. Despite their awareness of the need, did defendants consciously fail to take reasonable measures to provide the necessary treatment?

5

Defendants argue both that Alexander's eye condition did not constitute a serious medical need, and that their responses to his requests for an eye appointment did not constitute deliberate indifference. They are correct on both counts, which the court will discuss in turn.

A.  **Serious Medical Need & Knowledge**

The evidence supports defendants' position that Alexander's need for an eye examination and symptoms of headaches, watery eyes and seeing white spots did not amount to a serious medical need. As an initial matter, the need for an eye examination alone is generally insufficient to establish a serious medical need. *Franklin v. McCaughtry*, 110 Fed. Appx. 715, 721 (7th Cir. 2004). Rather, a serious medical need arises where the defendants are aware that the plaintiff's need for an eye prescription is so severe the plaintiff either hurts himself or cannot function in the prison setting. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996) (plaintiff, who suffered from double vision and lack of depth perception, suffered injuries from not having glasses, including almost complete blindness); *Benter v. Peck*, 825 F. Supp. 1411 (S.D. Iowa 1993) (vision of 20/400 was a serious medical need because eyesight fell within definition of blindness and plaintiff was unable to work or function in general population without glasses); *Gevas v. Shering*, No. 14-cv-134-NJR, 2016 WL 1221937, at *5 (S.D. Ill. Mar. 29, 2016) ("significantly blurred vision, double vision, or loss of depth perception, constitutes a serious medical need").

By comparison, a plaintiff's complaints about eye issues interfering with daily life in a marginal fashion does not amount to a serious medical need. *See, e.g., Starks v. Powers*, No. 02-cv-1252, 2006 WL 929359, at * (S.D. Ill. Apr. 10, 20016) (complaints about

6

"pain, tearing inability to read "very, very small" print without glasses did not constitute a serious medical need); *Dobbey v. Randle*, No. 11-cv-146, 2013 WL 4821027, at *5 (N.D. Ill. Sept. 10, 2013) (lack of eyeglasses did not constitute serious medical condition where there was no severe impairment to inmate's inability to read, write or see); *Lavin v. Hulick*, No. 09-cv-477, 2010 WL 213250, at *6 (S.D. Ill. May 27, 2010) (dismissing deliberate indifference claim where plaintiff did not allege any physical harm and "was simply inconvenienced in that he was unable to read").

Here, there is no question that defendants' knew that Alexander needed an eye examination to update his prescription for reading glasses, but no evidence suggests that *anyone* at CCI knew that his need for glasses was severe enough that he was remotely close to doing permanent damage or unable to function without an updated prescription, nor even that he faced any hardship beyond experiencing discomfort after reading. While Alexander claims that there was a three-week period of time before receiving his new glasses when he could not read because of the pain, there is no evidence indicating that he reported this inability to read to any of the defendants, nor to anyone else at the prison until he filed a grievance about it on May 7, 2015, some two weeks *after* receiving an eye exam. (*See* dkt. #2-1, at 1.) Alexander claims that his first request to be seen "clearly indicated" that was unable to read. Thus, even accepting Alexander's representation that he could not read after January of 2015 because it was too painful, there is no evidence that any of the *defendants* knew that Alexander's eye strain was so severe, much less that it was leading to migraine headaches.

In fairness, Alexander did report symptoms of "very bad" headaches, watery eyes and white spots related to his need for an eye appointment in early March, and although being told the next day that his eye exam was scheduled, he did not receive the exam for another six weeks. Yet that evidence does not support a finding that Alexander was actually experiencing a *serious* medical need. For one, no evidence suggests that Alexander requested or received medication to treat those symptoms, nor that he was ever diagnosed with any condition that would suggest that he needed treatment beyond a new eye prescription. In fact, the only evidence suggesting that he experienced headaches, watery eyes, or white spots are the records of his requests for an eye appointment and the optometrist's notes about the appointment itself, which does little to support Alexander's position.

Specifically, while Alexander began asking to see an eye doctor on January 8, 2015, for the next two months, the only reason he gave was to have his "two-year" check up. Indeed, it was not until March 5 that he complained about being in pain, and even then only that reading causes headaches, his eyes not to focus, and him to see white spots sometimes. There is then another *one month* delay, until on April 5, when Alexander complained that his headaches were getting worse, his eyes water and he sees white spots when he tries to focus. Before his April 23 appointment, therefore, Alexander's *most* serious complaints were headaches and problems focusing, and even those were not expressed as serious or debilitating until the last few weeks before the exam itself.

Regardless, those types of complaints, alone, do not establish that he was suffering from a severe medical need. *Bellah v. McGinnis*, 42 F.3d 1388, 19994 WL 664926, at *1 (6th Cir. 1994) (unpubl.) (moderate nearsightedness); *Swaissi v. Cotton*, No. 3-01-cv-1607-

8

D, 2002 WL 492905, at *2 (N.D. Tex. Mar. 28, 2002) (difficulty reading); *Davidson v. Scully*, 155 F. Supp. 2d 77, 88-89 (S.D.N.Y. 2001) (eye infection and irritation, tearing, headaches, blurry vision); *Hayes v. N.Y.S. D.O.C. Officers*, 1998 WL 901730, at *8 (S.D.N.Y. Dec. 28, 1998) (eye pain, tearing, impaired vision). Only one piece of evidence could conceivably support a finding of a serious medical need. Dr. Ruder noted Alexander's complaint of "increase in migraines, after reading," *during the April 23* eye appointment. Certainly, migraine pain can be quite debilitating, potentially requiring a physician diagnosis and treatment plan, so if Alexander was suffering from migraines, that could constitute a serious medical need. Yet Dr. Ruder's notes do not show that Alexander complained of migraines *before* his eye exam, nor was there ever a formal diagnosis of migraines, as opposed to a note about *Alexander's* subject complaint.

In fact, no evidence suggests that Alexander has *ever* been diagnosed with migraines, nor that he even complained to any health care personnel (besides to Dr. Ruder on April 23rd) about migraines. Rather, his complaints were consistently about headaches, which continued even after his appointment, but again never using the word "migraine." At the end of the day, while Dr. Ruder's use of the word "migraine" raises a red flag about Alexander's condition, he has submitted *no* evidence confirming that he suffered from this serious condition. *See Moore v. Liszewski*, No. 1:07-cv-1173, 2009 WL 3156711, at *4 (N.D. Ill. Sept. 28, 2009) (finding that plaintiff's self-reported migraines did not amount of a serious medical need because she was never diagnosed with migraines), *rev'd* on other grounds, *Moore v. Mahone*, 652 F.3d 722, 723 (7th Cir. 2011).

Mashak cites two district court decisions that underscore plaintiff's lack of evidence. First, in *George v. Smith*, 467 F. Supp. 2d 906 (W.D. Wis. 2006), this court held that a prisoner who had to wait three to four months before receiving a "routine" eye examination, and claimed to have suffered from watery eyes and increased light sensitivity, did not present a serious medical need. *Id*. at 915. The court hinged its reasoning on the fact that the examination was "routine" in nature, and that the plaintiff failed to submit evidence that support his claim that he was actually light sensitive. *Id.* Second, Mashak cites a more recent decision from the Eastern District of Wisconsin. In *Padilla v. Ruck*, No. 14-cv-98, 2015 WL 2402012 (E.D. Wis. May 20, 2015), the court concluded that the plaintiff's complaints of headaches, eye-aches, and dizziness did not amount to a serious medical need because he did not raise them with the medical staff, and the record showed that his use of aspirin could have been to address another, unrelated injury. In reaching this conclusion, the court that acknowledged that the need for prescription glasses "could conceivably constitute a serious medical need," but that it was not "per se objectively serious." *Id.* at *9 (citing *Franklin v. McCaughtry*, 110 F. App'x. 715, 721 (7th Cir. 2004). Both of these decisions further support judgment in defendants' favor because Alexander's failure to submit any evidence establishing that the eye appointment delay (1) created a barrier to him functioning normally or (2) caused him to suffer needlessly from severe pain during the delay.[2] Even assuming Alexander was suffering from a serious medical need, a

---

[2] To the extent this were a closer call than it appears to this court, qualified immunity would still shield Mashak from damages liability. Qualified immunity protects officials from liability for monetary damages where the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017). Here, Alexander has not cited any cases establishing that he had a clearly

reasonable fact finder could not conclude that either defendant responded with deliberate indifference.

**B. Deliberate Indifference**

Plaintiff is proceeding on his deliberate indifference claims on two theories. First, he is proceeding against Mashak based on her personal involvement in the decisions about his eye treatment. Second, he is proceeding against Mashak and Dr. Richter in their supervisory capacities, claiming that CCI's optical department suffers from a "systematic deficiency" that they both failed to address.

As for Mashak's specific response to Alexander's request for treatment, the court finds summary judgment in her favor appropriate for the simple reason that she had no personal involvement. For her part, Mashak represents that she did not know about Alexander's requests until *after* his April 23 appointment, and indeed, not until she received his complaint about the delay in early May. While Alexander alleged in his complaint that Mashak received his April 5, request in which he explained his pain and worsening symptoms, the records Alexander submitted indicate that another HSU staff member, not Mashak, was the one that responded to his request. Moreover, Alexander has submitted *no* other evidence suggesting that Mashak actually knew about his request. As such, there is no genuine dispute about whether Mashak knew about Alexander's requests for an eye

---

established right to an earlier eye appointment, or that his symptoms qualified as a serious medical need. As such, even if Mashak's actions constituted deliberate indifference, she would not be held liable for damages. While Dr. Richter asserted qualified immunity as an affirmative defense in his answer, he has not moved for summary judgment on that ground, so he does not benefit from this defense at this stage.

appointment and related symptoms, much less failed to take reasonable measure to address them: she did not know about them so was not in a position to respond.

As for plaintiff's supervisory capacity claims, he asserts that Mashak, as the HSU supervisor, and Dr. Richter, as the manager of CCI's optical department, knew that CCI's optical department's staffing suffered from a systematic deficiency, but did nothing to correct it. *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997) (supervisor may be liable if he knows about and approves of conduct); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (supervisor may be held liable if he had control over deficient training or flawed policies). This claim also fails for two, independent reasons.

*First*, the evidence of record does not support a finding that CCI's optical department was systemically deficient. Certainly, the Seventh Circuit has upheld a finding of systematic deficiencies if department-wide problems have been shown to affect inmates adversely on a widespread basis. *See, e.g., Wellman v. Faulkner*, 715 F.2d 269, 272-74 (7th Cir. 1983) (systematic deficiencies found based on (1) a language barrier between inmates and the majority of physicians, (2) psychiatrist position was vacant for two years, (3) prisoners were denied important surgeries for two to five years, and (4) medical supplies were reused and not restocked); *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 428-31 (7th Cir. 1989) (systematic deficiencies found where prison failed to review and change procedures after an inmate died from medication prescribed over the phone). Nevertheless, the Seventh Circuit has *rejected* claims of systematic deficiencies where an inmate only presents evidence of his own or a few others' medical care and fails to submit evidence

showing that the practices he complains about have adversely affected a wider group of inmates as well. *See, e.g., Holmes v. Sheahan*, 930 F.2d 1196, 1201 (7th Cir. 1991) (inmate's claims did not give rise to an inference that the county "maintained inadequate procedures which were the proximate cause of injury"); *Gutierrez v. Peters*, 111 F.3d 1364, 1375 n.10 (7th Cir. 1997) (a few instances of delay did not demonstrate a pattern of conduct that would establish deliberate indifference).

Here, Alexander offered only evidence of a three and a half month a delay between when *he* requested an eye appointment and when he was seen. While a system involving multiple-month waiting period for a routine optical appointment is not ideal, there is no evidence suggesting that such a waiting period put Alexander or other inmates at risk of receiving inadequate optical care. On the contrary, HSU staff responded to Alexander's requests, informed him about the waiting period and ensured that he was seen by an optometrist. He was also seen within weeks of advising HSU that his eye strain in reading was causing more severe headaches and other symptoms. Not only does the record fail to show what others' wait times were for a requested eye exam, but it fails to show what any inmate's experience was, including plaintiff, when a more serious, immediate need for treatment presents itself. Accordingly, a reasonable fact finder could not conclude on this record that CCI's optical department suffers from a systematic deficiency in addressing eye care needs amounting to deliberate indifference.

*Second,* even if there were evidence of such a deficiency, plaintiff has not shown that Mashak, or even Dr. Richter, had the authority to increase the frequency of optical appointments at CCI. Mashak in particular did not schedule eye doctors or make

13

appointments at CCI, and plaintiff offered no evidence to the contrary. Instead, plaintiff simply argues that Mashak *should* have changed the way CCI handled optical appointments. However, since the evidence is that CCI had contracted out optical services to Richter Professional Services, Mashek appears to have no role except to schedule eye exams, or at least the trier of fact would have to find as much, absent some evidence of her authority to override CCI's and Richter's judgment as to the need for more regular or emergency exams.[3]

Arguably, on this record, Dr. Richter was also not responsible for determining the amount of time that optometrists are available at CCI. While he appears to have been responsible for determining who from Richter Professional Services actually appears at CCI to examine the inmates, he does not have the ability to increase the appointment times available at CCI. Rather, it appears on this record that the DOC's Bureau of Health Services Medical Director decided the number of days a month optometrists visit CCI. Of course, Richter and other optometrists affiliated with his company may have had some responsibility as medical professions to voice concerns if the scheduling of appointments appeared inadequate, but plaintiff has failed to establish a basis for the trier of fact to reach that conclusion. Accordingly, a reasonable fact finder could not conclude that CCI's optical department suffers from a systematic deficiency, or that either of the defendants had the authority to improve it and failed to do so.

---

[3] Indeed, unlike Richter, there is no evidence that Mashak had any medical training to presume to make such an assessment.

For these reasons, as well as plaintiff's failure to prove a serious medical need, summary judgment in defendants' favor is appropriate.

II. Other Motions

In light of the court's grant of summary judgment, the court will only briefly address plaintiff's other pending motions.

A. Motion to Strike Expert Witness Disclosures (dkt. #46)

Plaintiff filed a motion to strike expert witness disclosures, claiming the defendants' experts did not submit a report along with the disclosures. It does not appear that any of the defendants' experts were required to submit a formal report because they were not retained for expert testimony. *See* Fed. R. Civ. P. 26(a)(2)(B). Rather, defendants were only required to disclose the subject matter and factual basis of the expected testimony. *Id*. at 26(a)(2)(C). Regardless, this motion will be denied as moot, since the court has not relied on any expert testimony in evaluating defendants' summary judgment motions and this case is not proceeding to trial.

B. Motion to Strike Declaration (dkt. #66)

Plaintiff seeks to strike portions of Dr. Richter's declaration and corresponding proposed findings of fact, describing the context of Dr. Ruder's notes about Alexander's examination. Plaintiff further asks the court to strike Dr. Richter's statements and the corresponding proposed facts related to an October 2014 lockdown at CCI that, according

to Dr. Richter, caused a temporary reduction in optometry services there. Finally, plaintiff seeks to strike the portions of Dr. Richter's declaration averring that he was not deliberately indifferent, on the ground that those statements are conclusory in nature.

For purposes of summary judgment, however, the court considered Dr. Richter's statements related to his *personal* involvement in CCI's optical department only. Moreover, in interpreting Alexander's medical records, the court relied upon the statements within the records themselves, and not upon Dr. Richter's interpretation about them nor even his statements about those records. Similarly, the court considered Dr. Richter's statements about deliberate indifference as merely his belief about his conduct, but did not rely on those statements in evaluating the merit of Alexander's claim. As plaintiff has pointed to no reason why Dr. Richter's statements should be completely excluded from the record, however, his motion to strike will be denied.

### C. Motion for Subpoenas (dkt. #75)

Plaintiff requests that the Clerk of Court issue him two signed blank subpoenas because he wishes to submit interrogatories and requests for production to a CCI employee to find out if other inmates have filed grievances about delays in optical exams. Since the court concluded that Alexander's claims fail because he was not personally experiencing a serious medical need when requesting an eye exam, and that the delay he experienced in waiting for his eye appointment did not amount to deliberate indifference, this request is now moot. While other inmates might have grievances about the optical department's scheduling system, the fact of the matter is that his particular experience does not create

an inference of a constitutional violation. Accordingly, the court will deny this request as moot as well.

### D. Motion to Amend Complaint (dkt. #76)

Finally, at this late stage, Alexander wishes to amend his complaint to add several defendants, who he claims are also involved in his Eighth Amendment claims. Those defendants are: Rachel Pafford, Keisha Perrenoud, C. O'Donnell, Richter Professional Service, S.C., and Edward Bradley. Alexander claims that each of these defendants are also responsible for systematic deficiencies in CCI's optical department. The motion will be denied because it would be unduly prejudicial and ultimately futile. *Sound of Music v. Minnesota Mining and Mfg. Co.*, 477 F.3d 910, 922-23 (7th Cir. 2007).

As an initial matter, Alexander waited too long to seek to amend his complaint, and permitting him to amend now would unduly prejudice the defendants. Alexander filed his complaint on November 30, 2015; the court granted him leave to proceed on April 15, 2016; the court set March 31, 2017, as the deadline for the parties to submit dispositive motions and September 15, 2017, as the discovery cutoff. (Prelim. Pretrial Conf. Order, dkt. #27.) At no point until June 30, 2017, after the defendants filed their motions for summary judgment and Alexander responded to it, did he seek leave to amend his complaint.

Moreover, Alexander offers no good reason for his inordinate delay in seeking to amend his complaint. Instead, plaintiff indicates that he always intended to add new defendants, but did not learn their identities until recently. However, this works against

him: (1) if he knew he was going to amend his complaint, he should have requested to do so earlier in this proceeding; or (2) at minimum, he should have made discovery of other potential defendants a priority early in this lawsuit. The court has granted Alexander leniency in other respects during the course of this lawsuit, and would likely have been less skeptical of an earlier motion to amend. However, to seek to amend now is simply too prejudicial to the defendants, who have already devoted considerable resources to responding to Alexander's other motions and preparing their own summary judgment motions.

More importantly, permitting plaintiff to amend his complaint now would not change the disposition of his Eighth Amendment claims. The court has already explained the reasons why these claims fail, and adding additional defendants now would not change that conclusion. Accordingly, the court will deny his request to amend as futile. *See CogniTest Corp. v. Riverside Pub. Co.*, 107 F.3d 493, 499 (7th Cir. 1997) (leave to amend may be denied "where amendment would be futile").

ORDER

IT IS ORDERED that:

(1) Defendants motions for summary judgment (dkts. #38, #48) are GRANTED;

(2) Plaintiff's Motion to Strike Expert Witness Disclosures (dkt. #46), Motion to Strike Declaration (dkt. #66), Motion for Issuance of Subpoena (dkt. #75), Motion to Amend Complaint (dkt. #76) are DENIED.

(3) The clerk of court is directed to enter judgment in defendants' favor and close this matter.

Entered this 22nd day of November, 2017.

           BY THE COURT:

           /s/

           WILLIAM M. CONLEY
           District Judge